UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Cause No. 1:22-CR-00040-HAB-SLC |
| ) | |
| GUSTAVO ADOLFO CALDERON ) | |
| MARTINEZ ) | |

**OPINION AND ORDER**

Defendant, Gustavo Adolfo Calderon Martinez, pleaded guilty to distributing 100 grams or more of heroin in violation of 21 U.S.C. § 841(a)(1). The presentence investigation report ("PSR") held him responsible for between 1,000 and 3,000 kilograms of Converted Drug Weight ("CDW") based on the drugs distributed personally by Defendant as well as drugs found in a stash house. (ECF No. 130, ¶ 65). The PSR also included enhancements for maintaining a drug premises—the stash house—which Defendant does not own. (*Id.* ¶ 66). And the PSR provided an enhancement for using a minor to commit an offense because Defendant's children accompanied him during two drug transactions. (*Id.* ¶ 68). Defendant objected to the CDW calculation and the enhancements. (ECF No. 129). This Court held an evidentiary hearing for these issues on October 19, 2023. (ECF No. 142). Defendant's objections are now fully briefed (ECF Nos. 152, 161, 162) and ripe for ruling.

**I.     Factual Background**

In 2021, the FBI began investigating a drug trafficking organization connected to and supplied by the Jalisco New Generation Cartel ("CJNG"). (ECF No. 130, ¶ 10). Agents used a confidential human source ("CHS") to perform controlled drug buys from Defendant with the CHS supplying significant information about the organization's distribution in Fort Wayne, Indiana. (*Id.* ¶¶ 10-14). In October 2021, the CHS informed investigators that Defendant was selling

cocaine for between $32,000 and $37,000 per kilogram depending on its purity. (*Id.* ¶ 11). The CHS also informed officers that Defendant worked with Gerardo Nino Romero, that Defendant was the nephew of a CJNG member, and that the drugs were being routed through Aurora, Illinois. (*Id.*). Because of his connection through his uncle, Defendant could sell large quantities of cocaine, marijuana, heroin, and methamphetamine with Defendant receiving drug loads on an ongoing basis. (*Id.* ¶¶ 11, 18, 26, 33-50).

In March 2022, Defendant informed the CHS that he had a shipment of cocaine coming to Fort Wayne and would sell kilograms of cocaine for a lower price of $29,000. (*Id.* ¶¶ 23, 25). Defendant explained to the CHS that Nino Romero was cutting the cocaine for him and that the CHS could make a profit selling the cut cocaine. (*Id.* ¶ 21). The investigation corroborated all of this information provided by the CHS.

In total, the CHS performed four controlled buys—three from Defendant and one from Ramiro Nunez Diaz.[1] (*Id.* ¶¶ 12-21, 27-50). On April 6, 2022, Defendant sold around three ounces of cocaine to the CHS. (*Id.* ¶¶ 27-50). On the buy recording, Defendant discussed the product's quality and stated that more kilograms of cocaine were forthcoming. (ECF No. 149 at 48). Having only paid part of the purchase price, the CHS returned to pay the remaining amount on April 12. (*Id.* at 48-49). At this meeting, Defendant said that his uncle sent him a heroin shipment and that the CHS could purchase the drug for $28,000 per kilogram. (*Id.* at 50-51). Considering heroin typically goes for around $50,000 per kilogram, it appears Defendant was cutting the CHS quite a deal. (*Id.*) And this cheap price indicates that Defendant was getting a large quantity of heroin, as

---

[1] During the controlled buys, Defendant discussed his drug operation during recorded conversations in Spanish. TFO Martinez, an experienced drug investigator, is fluent in English and Spanish and provided an English translation for Defendant's conversations in Spanish. (ECF No. 130)

2

prices naturally decrease when buying in bulk. (*Id.*). Defendant also offered the heroin for $1400 per ounce or $1,100 per ounce if the CHS purchased ten ounces or more. (*Id.* at 52).

On April 20, 2022, Defendant sold about five ounces of heroin to the CHS. (ECF No. 130, ¶¶ 37-42). Before the deal, officers observed Defendant leave his house with his wife and two children. (ECF No. 149 at 10-11). He then drove with his family directly to the stash house where Defendant entered the house with Nino Romero while his family waited in the car for about thirty minutes. (*Id.* at 11-15, 20-22). Defendant left the stash house carrying a bucket which he placed in the rear cargo of the vehicle. (*Id.* at 15-18, 23). From there, Defendant then drove directly to meet the CHS and delivered the bucket containing the drugs as his family waited in the car nearby. (*Id.* at 24, 105-106). After, Defendant drove with his family straight home. (*Id.* at 18).

During this deal, Defendant discussed how the heroin looked like chocolate powder and had opened a kilogram to send a picture to his uncle to confirm it was the correct substance.[2] (*Id.* at 52-53). Defendant also told the CHS that he needed to cut the heroin to prevent his customers from overdosing but suggested that doing so would increase the CHS's profits. (*Id.* at 53-54). On April 21, 2022, the CHS paid Defendant for the heroin obtained the day before. (ECF No. 130, ¶ 43). At this meeting, Defendant asked if the CHS's customers liked the drug's quality and stated that he would cut the CHS a deal on the rest of his stash. (*Id.*).

On May 5, 2022, Defendant sold the CHS another four ounces of heroin. (*Id.* ¶¶ 45-50). This time, Defendant picked up his wife and at least one child from his home. (ECF No. 149 at 57-59). The family then drove to a mall where they picked up a pamphlet. (*Id.*). From the mall, Defendant went straight to the stash house. (*Id.*). Defendant drove with his family to the CHS's location and delivered the heroin in a sealed chip bag while his family waited nearby. (*Id.* at 59,

---

[2] When making this statement, Defendant used the term "kilos" which indicates that Defendand had more than one kilogram of heroin. (ECF No. 149 at 53).

110). During this deal, Defendant told the CHS that he got the heroin from Nino Romero's house and that he paid his "friend" to watch the drugs for him. (*Id.* at 62-63). Defendant also stated that he was expecting another load of cocaine and a kilogram of methamphetamine from his uncle. (*Id.* at 62-63; ECF No. 130, ¶ 50).

On May 24, 2022, officers served federal search warrants for the stash house and Defendant's residence. (ECF No. 130, ¶ 51). At the stash house, officers found a substantial amount of cocaine, heroin, and marijuana located in filing cabinets in the basement. (*Id.* ¶¶ 51-52). In total, officers found 60 pounds of marijuana, about 678 grams of heroin, and about 3.75 grams of cocaine. (*Id.*).

The stash house contained little furniture. (ECF No. 149 at 71). In the basement, there was a drug workspace with many tools of the drug trade, with the drugs stored in nearby filing cabinets. (*Id.* at 72). The tools included scissors, a heat sealer, a microwave, a blender, plastic bags, a mixing bowl, acetone, a hammer, scales, a calibration weight, rubber bands, a kilo press, exam gloves, kilo wrappers, and a cutting agent called Inositol. (*Id.* at 72-81).

During the search of Defendant's residence, officers found three ounces of cocaine in a chip bag in the laundry room among some children's toys. (*Id.* at 33-34). Officers also found a box of exam gloves and about $10,000 in cash. (*Id.* at 30-34). During an interview with Defendant, he admitted that he had been inside the stash house's basement and that Nino Romero gave him the cocaine. (*Id.* at 65-67).

Defendant's base offense level was 30 because the PSR held him responsible for at least 1,000 kilograms but less than 3,000 kilograms of CDW. (ECF No. 130, ¶ 65). The drug quantity calculations included drugs distributed personally by Defendant as well as the cocaine and heroin found at the stash house. (*Id.*). Pertinent here, the PSR also included enhancements for maintaining

a drug premises and using a minor to commit the offense. (*Id.* ¶¶ 66-68). After reductions for acceptance of responsibility, Defendant's total offense level was 31. (*Id.* ¶¶ 72-74). With a criminal history category of V and an offense level of 31, the PSR provided an advisory guideline range of 108 months to 135 months' imprisonment with a mandatory minimum sentence of 60 months. (*Id.* ¶¶ 95-96).

## II.   Legal Discussion

### A.   Drug Quantity Objection

"Unless otherwise specified," a defendant's base offense level is determined by all acts "committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant." U.S.S.G. §1B1.3(a)(1)(A). And "in the case of a jointly undertaken criminal activity," the base offense level includes all acts of others that were "(i) within the scope of the jointly undertaken criminal activity; (ii) is in furtherance of that criminal activity; and (iii) reasonably foreseeable in connection with that criminal activity[.]"[3] U.S.S.G. §1B1.3(a)(1)(B). A defendant may be accountable under both provisions, but it is only necessary to establish one. U.S.S.G. §1B1.3, comment. (n.3). In a drug conspiracy, the defendant "is responsible for both the drug quantities directly attributable to him and amounts involved in reasonably foreseeable dealings by co-conspirators." *United States v. Austin*, 806 F.3d 425, 431 (7th Cir. 2015). Even undelivered drugs may be considered in the drug quantity calculation so long as the defendant was reasonably capable and intended to supply them. U.S.S.G. §2D1.1, comment. (n.5).

Self-incriminating statements are appropriate evidence and are generally considered reliable for use at sentencing. *See United States v. Tankson*, 836 F.3d 873, 882 (7th Cir. 2016).

---

[3] "Jointly undertaken criminal activity" is a "criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy." U.S.S.G §1B1.3(a)(1)(B).

5

("No one was more qualified than [the dealer] himself to put a number on the amounts of [drugs] he was purchasing and reselling."). Even admissions by co-conspirators may be reliable enough to establish drug quantity for another defendant. *See United States v. Medina*, 728 F.3d 701, 705 (7th Cir. 2013) ("In making its drug quantity finding, the district court is not limited to evidence admissible at trial, but it must base its sentence on information with 'sufficient indicia of reliability to support its probable accuracy,' *United States v. Longstreet*, 567 F.3d 911, 924 (7th Cir. 2009)."). Because determining drug quantities is "not an exact science[,]" the Court "may make reasonable estimates of drug quantity based on evidence in the record[,]" including ambiguous testimony with sufficient indicia of reliability. *Austin*, 806 F.3d at 431 (citations omitted).

The Government bears the burden to prove by a preponderance of the evidence that Defendant was responsible for at least 1,000 kilograms of CDW. *See id.* at 430. Defendant contends that the evidence presented by the Government fails to meet this threshold. (ECF No. 161 at 9-10). He believes that the drugs found in the stash house were improperly attributed to his CDW. (*Id.*). To the contrary, the PSR properly held him accountable for the drugs from the stash house and, in any event, his own statements show that Defendant was responsible for at least 1,000 kilograms of CDW.

At minimum, Defendant marketed and distributed drugs which he obtained from the stash house as he was responsible for selling drugs that came from his uncle, a known cartel member. His actions and recorded statements establish that he had at least some control over the drug stash. In one conversation with the CHS, Defendant explained that he paid Nino Romero to hold the drugs for him. He also told the CHS that Nino Romero was cutting the drugs for him. These statements do more than establish Defendant as Nino Romero's pawn; they demonstrate his control over the entire drug stash.

6

Defendant went to the stash house to obtain the drugs before two of the deals. And he admitted to being in the stash house basement where drugs were stored and processed. During both deals, the drugs were concealed—using a dry-wall bucket on April 20th and a re-sealed chip bag[4] on May 5th. Defendant also had significant knowledge regarding shipments of kilograms of cocaine and heroin from his uncle, presumably to be stored at the stash house owned by Nino Romero. During the April 20 deal, Defendant had to open one drug package to confirm the nature of the substance with his uncle. The evidence shows that Defendant was clearly engaged in jointly undertaken drug trafficking with Nino Romero. *See* U.S.S.G. §1B1.3(a)(1)(B). Thus, the drugs in Nino Romero's house were properly attributed to Defendant as well.

Even if the drugs from the stash house were improperly included in the CDW (they were not), Defendant's own admissions provide sufficient evidence. Based on the controlled buys and cocaine found at the residence, Defendant is responsible for 282.3 kilograms of CDW. On the recordings, Defendant offered a full kilogram of heroin to the CHS in April 2022. *See* U.S.S.G. §2D1.1, comment. (n.5). With one gram of heroin equivalent to one kilogram of CDW, this alone yields a CDW of 1282.3 kilograms. And Defendant admitted to opening one of the kilograms (plural) of heroin in preparation for the deal on April 20. Based on Defendant's own statements, the Government has met its burden. Defendant's objection is OVERRULED.

### B. Maintaining a Drug Premises Objection

The Sentencing Guidelines provide a two-level enhancement if "the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance." U.S.S.G. §2D1.1(b)(12). The factors the Court should consider in determining whether the defendant

---

[4] Upon a search of the stash house, officers discovered a heat sealer in the basement which can reseal a chip bag for drug's concealment.

7

"maintained" the premises include not only whether the defendant held a possessory interest, but also the extent that the defendant controlled "access to, or the activities at, the premises." U.S.S.G. §2D1.1, comment. (n. 17). Manufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental uses." *Id.*

"A defendant who does not have a possessory interest can exercise control over a premises as a matter of fact when he actually conducts his drug enterprise from the location." *United States v. Ford*, 22 F.4th 687, 694 (7th Cir. 2022). Exclusive control over the drug den or drug storage area is not necessary for the enhancement to apply. *Id.* at 693-94. A defendant just needs to be more than a casual visitor. *Id.* And a drug premises can be established based on just one room or enclosure within the structure. *Id.* at 693-94; *United States v. Sanchez*, 810 F.3d 494, 497 (7th Cir. 2016).

The Court need not labor over whether the stash house is a drug premises. The Court found that it was with respect to Nino Romero. Suffice to say, that the stash house basement contained significant quantities of controlled substances and extensive tools of the drug trade. The house was relatively bare of furnishing with several empty living spaces. The stash house, or at least the basement, was maintained "for the purpose of manufacturing or distributing a controlled substance." U.S.S.G. §2D1.1(b)(12). This purpose was far more than incidental. *See* U.S.S.G. §2D1.1, comment. (n. 17).

There is no dispute that Nino Romero owned the stash house. Thus, the issue becomes whether Defendant controlled "access to, or the activities at," the stash house such that the enhancement should apply. *Id.* To that end, the Government contends that Defendant directly maintained the stash house because "he aided, abetted, induced, procured, and willfully caused

8

Nino Romero to hold the drugs for him."[5] (ECF No. 152 at 18). Of note, Defendant obtained heroin from the stash house on two controlled buys and repeatedly discussed drug shipments arriving for his own distribution. Defendant counters that the Government failed to establish where he went inside the stash house. (ECF No. 161 at 8-9). With just the basement being where the drugs and drug tools were stored, there is no evidence that Defendant actually entered the basement. (*Id.*). Defendant apparently believes that just the stash house basement was a drug premises, not the entire stash house.

First, the Court is not convinced that the entire stash house was not maintained as a drug premises. There were empty living spaces and very little furniture in the home, suggesting that long-term stays were infrequent. But even giving Defendant the benefit of the doubt, enough evidence exists to show that Defendant exercised sufficient control over the basement and drug stash to apply the enhancement.

Although Nino Romero lived there, Defendant used the stash house solely to conduct his drug trafficking. On recording, Defendant stated that he was paying Nino Romero to watch the drugs for him. In this manner, Defendant maintained control over the drug loads coming from his uncle. And the evidence suggests that only Defendant was distributing the drug stash, not Nino Romero. Defendant retrieved the drugs from the stash house when he was ready to sell them, with

---

[5] Some circuits have applied the drug premises enhancement based on a co-conspirator's conduct through the concept of jointly undertaken criminal activity. *United States v. Rich*, 14 F.4th 489, 495 (6th Cir. 2021); *United States v. Holmes*, 767 Fed. Appx. 831, 839 (11th Cir. 2019). Colloquially referred to as *Pinkerton* liability, *Pinkerton v. United States*, 328 U.S. 640 (1946), the Government seeks to invoke this principal—in the alternative— to establish the drug premises enhancement. (ECF No. 152 at 16-19). Yet the Seventh Circuit has not determined this issue. And there is a split in this district on whether *Pinkerton* liability can be used to apply the drug premises enhancement solely on the actions of others through a jointly undertaken criminal activity. *See United States v. Lewis*, 2020 WL 1164434 (N.D. Ind. Mar. 11, 2020) (Springmann, C.J.) (allowing the use of *Pinkerton* liability to establish the drug premises enhancement); *United States v. Henderson*, 2020 U.S. Dist. LEXIS 218960 (N.D. Ind. Nov. 23, 2020) (Brady, J.) (prohibiting the use of *Pinkerton liability* to establish the drug premises enhancement). Because there is sufficient evidence to determine that the Defendant directly maintained the stash house as a drug premises, the Court need not consider whether *Pinkerton* liability applies.

all drugs being found in the basement when officers executed the search warrant. Simply, the Government has shown that Defendant maintained the stash house for drug trafficking by a preponderance of the evidence. Defendant's objection to the drug premises enhancement is OVERRRULED.

### C. Use of a Minor Enhancement

U.S.S.G. §3B1.4 provides for a two-level enhancement "[i]f the defendant used or attempted to use a person less than eighteen years of age to commit the offense or assist in avoiding detection of, or apprehension for, the offense." U.S.S.G. §3B1.4. Use or attempted use includes "directing, commanding, encouraging, intimidating, counseling, training, procuring, recruiting, or soliciting." U.S.S.G. §3B1.4, comment. (n.1).

Multiple circuits have applied this enhancement when a defendant used a minor as a decoy to avoid detection of his illegal activity. *United States v. Mata*, 624 F.3d 170, 175-76 (5th Cir. 2010); *United States v. Futch*, 518 F.3d 887, 896 (11th Cir. 2008); *United States v. Preciado*, 506 F.3d 808, 810 (9th Cir. 2007). The Government here contends that Defendant was using his children as a decoy on the April 20 and May 5 controlled buys. TFO Martinez opined that drug traffickers will use their wives and children as cover when making drug deliveries because their presence makes the trip look more legitimate. (ECF No. 149 at 86-88). Notably, Defendant's children only accompanied him during heroin deals. As drug traffickers are typically aware of what drugs lead to higher sentences—with heroin being towards the top of the list—this suggests that Defendant was using his family to avoid greater penalties from heroin dealing. (*Id.*).

The Court has found no Seventh Circuit authority, and the parties have provided none, applying the enhancement based solely on a minor's use as a decoy. But virtually all authority is

consistent in that "the mere presence of a minor is insufficient to support the application of §3B1.4." *See United States v. Jimenez,* 300 F.3d 1166, 1170 (9th Cir.2002) ("Absent other evidence, the 'mere presence of a minor' is insufficient to support the application of § 3B1.4."); *see also United States v. Alarcon*, 261 F.3d 416, 422 (5th Cir.2001) (concluding that mere presence of children in vehicle was insufficient to show use, absent evidence that defendant "made, wanted, or suggested" that minor children ride in vehicle to avoid detection); *United States v. Molina*, 469 F.3d 408, 415 (5th Cir. 2006). And, as with other circuits, the Seventh Circuit requires that the defendant take some "affirmative action" to involve the minor in the crime for the enhancement to apply. *United States v. Ramsey*, 237 F.3d 853, 859 (7th Cir. 2001).

The Government relies heavily on *Mata* where the Fifth Circuit determined that "a defendant who makes a decision to bring a minor along during the commission of a previously planned crime as a diversionary tactic or in an effort to reduce suspicion is subject to having her sentence enhanced under § 3B1.4." 624 F.3d at 175. But "[t]his is not to say that every defendant who brings a minor child along while smuggling drugs or aliens is subject to having her sentence enhanced under § 3B1.4." *Id.* at 176. "The district court should consider additional circumstantial evidence to determine whether the defendant used the minor to avoid detection." *Id.*

Mata was convicted for transporting an undocumented alien for financial gain. *Id.* at 172. The illegally transported person was in the cargo area underneath blankets, luggage, and a stroller. *Id.* Mata was driving and the other seats were filled with two of Mata's children, a friend, and the friend's child. *Id.* Because Mata needed to get past a Border Patrol checkpoint, she likely knew her vehicle would be inspected. *Id.*

The circumstantial evidence demonstrated that Mata was attempting to impersonate a family unit to evade suspicion that she was engaged in criminal conduct. *Id.* at 177. Specifically,

11

the presence of the children would help make the presence of the stroller in the trunk seem more plausible. *Id.* The court also noted that Mata could have avoided bringing the children by leaving them with her friends. *Id.*

Similar to *Mata,* Defendant could have just left his children at home with his wife during these deals. But the present situation is more than a stone's throw from *Mata*. Defendant was not illegally transporting a person with the expectation of facing a border checkpoint. To that end, the Government assumes that the children's presence would allay suspicion during a traffic stop or make a traffic stop less likely. Yet nothing suggests that the presence of a child can impair an officer's investigation during an otherwise valid traffic stop. A child's presence also gives officers more potential reasons to pull a vehicle over as there are statutory seat belt requirements that apply exclusively to children. And there is nothing to suggest that the children would make the concealment devices here—a drywall bucket and a chip bag—more plausible.

Other cases relied on by the Government are also distinguishable. For example, in *United States v. Futch,* Futch took the affirmative step of physically placing a baby on top of cocaine to conceal it. *United States v. Futch*, 518 F.3d 887. Defendant's children did not function as "human shields" to conceal the heroin. *Id.* at 896-897. Where there is no evidence that the children would help avoid detection, a child's mere presence is insufficient to support the enhancement. *See United States v. Molina*, 469 F.3d 408 (5th Cir. 2006) (holding that the use of a minor enhancement was wrongly applied when there was no evidence that a defendant's seventeen-year-old girlfriend would help avoid detection).

Admittedly, this case presents a close call. True, Defendant could have left his children at home with his wife during the drug transactions. The children only accompanied Defendant on deals where heroin was involved. And Defendant made only one other brief stop aside from going

to the stash house and the controlled buy locations. Even still, nothing more suggests that Defendant used his children to execute the deals. Although the circumstances do raise eyebrows, the Government is essentially asking that the enhancement apply just because the children were there. That the Court cannot do. The Government must provide something more to meet its burden. Defendant's objection to U.S.S.G. §3B1.4 is SUSTAINED, and the use of a minor enhancement should not be applied to Defendant.

### III. Conclusion

For these reasons, Court SUSTAINS IN PART Defendant's objections (ECF No. 129) to the extent that the Court finds that the PSR should be revised to reflect that use of a minor enhancement, U.S.S.G. §3B1.4, does not apply to Defendant. Defendant's objections are OTHERWISE DENIED. A sentencing date shall be set by separate entry.

SO ORDERED on April 15, 2024.

    s/ Holly A. Brady
CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT